IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DANIEL BOYD,                            )
                                        )
         Plaintiff,                     )
                                        )
v.                                      )       CASE NO.: 2:16-cv-68-WKW-GMB
                                        )       [WO]
TOWN OF HAYNEVILLE, *et al.*,           )
                                        )
         Defendants.                    )


## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b)(1), this case was referred to the undersigned United

States Magistrate Judge for review and submission of a report with recommended findings

of fact and conclusions of law. Doc. 5.  Plaintiff Daniel Boyd filed this action on February

2, 2016, alleging a number of federal and state claims arising out of his arrest for the crime

of reckless endangerment. Doc. 1.  Now before the court are the Motion for Summary

Judgment (Doc. 41) filed by Defendant Kelvin Mitchell and the joint Motion for Summary

Judgment (Doc. 43) filed by Defendants David Daniel, George Davis, Kim Payton, Sheryll

Phipher, Carole Scrushy (collectively, the "councilmembers"), and the Town of

Hayneville.  After careful consideration of the parties' submissions, the applicable case

law, and the record as a whole, the undersigned RECOMMENDS that the motions for

summary judgment (Docs. 41 & 43) be GRANTED in part and DENIED in part, as set

forth below.  Because this recommendation results in summary judgment for Defendants

on all federal claims, the undersigned also RECOMMENDS that the District Court decline

to exercise supplemental jurisdiction over the remaining state-law claims.

## I.  JURISDICTION AND VENUE

The court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations to support both.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

In responding to a properly supported motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249−50 (1986) (citations omitted).  "However, disagreement between the parties is not significant unless the disagreement presents a genuine [dispute] of material fact." *Gamble v. Pinnoak Resources, LLC*, 511 F. Supp. 2d 1111, 1122 (N.D. Ala. 2007) (internal

quotation marks omitted).  A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a district court considers a motion for summary judgment, all evidence and inferences drawn therefrom must be viewed in the light most favorable to the non-moving party. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  "The court must avoid weighing conflicting evidence or making credibility determinations. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Gamble*, 511 F. Supp. 2d at 1122 (internal quotation marks omitted).  "Where a reasonable fact finder may draw more than one inference from the facts, then the court should refuse to grant summary judgment." *Id.* (internal quotation marks omitted).

## III.  STATEMENT OF FACTS

At all times relevant to this lawsuit, Plaintiff Daniel Boyd ("Dr. Boyd") was the superintendent of schools in Lowndes County, Alabama. Doc. 1.  Dr. Boyd alleges that his rights under state and federal law were violated when Kelvin Mitchell ("Chief Mitchell"), the Chief of Police for Hayneville, Alabama, arrested him for reckless endangerment. Doc. 1.  Dr. Boyd brought suit against Chief Mitchell, the Town of Hayneville (the "Town"), and members of the Hayneville Town Council. Doc. 1.  On May 25, 2016, Dr. Boyd amended his Complaint to add Helenor Bell, the former mayor of Hayneville, as an additional defendant, but she has since been dismissed as a party to this action. *See* Docs. 32 & 49.

**A.    The Incident**

On Monday, September 30, 2013, at approximately 10:00 a.m., a 13-year-old female student at Hayneville Middle School reported that she was sexually assaulted by a custodian, Lee Saffold ("Saffold"). Doc. 46-3 at 5; Doc. 47-1 at 24.   Specifically, the student alleged that Saffold kissed her and grabbed her in the buttocks and genital area. Doc. 47-1 at 40.   After reporting the incident to an assistant principal, the student was immediately brought to the office of Erica Chatman ("Chatman"), the school's guidance counselor. Doc. 46-4 at 4.   The student was reportedly "crying hysterically" as she explained the details of the incident to Chatman. Doc. 46-4 at 5.   However, the accounts of this meeting given by Chatman and the school's principal at the time, Antonio Williams ("Principal Williams"), diverge.   Chatman reports that during her meeting with the student, which lasted about 15 minutes, Saffold entered the office uninvited and without knocking. Doc. 46-4 at 5.   Saffold appeared nervous and said that he thought Chatman needed something to be moved, even though she had not called for him. Doc. 46-4 at 6.   The door to Chatman's office was closed and a "stop sign" was posted outside, indicating that she was in a session with a student. Doc. 46-4 at 5.   After Saffold left, but with the student still in her office, Chatman attempted to call the Department of Human Resources ("DHR"), but was unable to speak to a DHR representative. Doc. 46-4 at 6.   She then reported the incident to Principal Williams, who also attempted to notify DHR later that afternoon. Doc. 46-5 at 6 & 8.

Principal Williams, on the other hand, maintains that Chatman first came to his office to report the incident to him and that they returned to her office together to speak

with the student before Saffold barged in. Doc. 46-5 at 6–7.  Principal Williams estimated that Chatman reported the incident to him around noon and that they spoke together with the student for approximately 30 to 40 minutes. Doc. 46-5.  Principal Williams recalls that he escorted Saffold to his own office after Saffold entered Chatman's office, told Saffold not to leave, and "locked the door to the office so no one could come in." Doc. 46-5 at 7.

At approximately 1:30 p.m., Principal Williams met with Saffold and Dr. Boyd at Dr. Boyd's request in his office at the Lowndes County Board of Education. Doc. 46-5 at 8–9.  Dr. Boyd stated that he contacted DHR at around 2:00 p.m., but did not speak with a DHR representative until approximately 4:15 p.m. Doc. 47-1 at 22 & 87.  At some point after 2:00 p.m., Chatman, Principal Williams, the student, and the student's mother met with Dr. Boyd in his office. Doc. 46-4 at 7.  After reporting the incident but before meeting with Dr. Boyd, the student remained either in Chatman's office or the school's front office. Doc. 46-4 at 7.  Chatman explained that, while she was not sure exactly what happened between Saffold and the student, she was sure "something did happen to her" because the student was "visibly upset" and "hysterical." Doc. 46-4 at 9.  Chatman interpreted Saffold's unauthorized entry into her office while meeting with the student to be "a sign of guilt." Doc. 46-4 at 9.

## B.    The School District's Response

The same day, and even before Chatman and Principal Williams left the school to meet with Dr. Boyd, Principal Williams initiated an investigation at Dr. Boyd's direction. Doc. 46-5 at 11.  He spoke to several students who may have observed the incident, a physical education teacher, and the teacher to whom the student first reported the incident.

Doc. 46-5 at 11.  Principal Williams also spoke with Saffold himself, and viewed footage from the school security cameras in the area where the student reported the incident to have occurred. Doc. 46-5 at 9; Doc. 46-5 at 11.

Dr. Boyd testified in his deposition that he met with the student, Chatman, and Principal Williams on the afternoon of September 30. Doc. 47-1 at 24.  According to Dr. Boyd, the student told three varying accounts of the incident. Doc. 47-1 at 24.  As a result of these inconsistencies, Chatman, Principal Williams, and Dr. Boyd were unsure "whether the custodian was telling the truth or whether the student [was] telling the truth." Doc. 47-1 at 25.  Dr. Boyd and Principal Williams were hesitant to believe the student because of the inconsistencies in her story, the limited amount of time in which the incident was alleged to have taken place, and the fact that Principal Williams spoke to the student immediately after the incident (but before it was reported) and she appeared normal and did not mention the incident. Doc. 47-1 at 25; Doc. 46-5 at 7.  Dr. Boyd placed Saffold on unpaid administrative leave and instructed him not to return to Hayneville Middle School. Doc. 47-1 at 29.

Between September 30 and October 10, Dr. Boyd conducted an independent investigation during which he met with the student, Saffold, Chatman, Principal Williams, several school employees, and a DHR employee. Doc. 47-1 at 29–32.  Dr. Boyd also reviewed Saffold's work history for complaints and disciplinary actions. Doc. 47-1 at 30.  Additionally, Dr. Boyd considered the fact that, according to DHR, the student had previously made a similar unsubstantiated complaint at a school in Montgomery, Alabama. Doc. 47-1 at 31.  Based on this investigation, Dr. Boyd concluded that the student had been

untruthful and that Saffold was innocent of the alleged wrongdoing. Doc. 47-1 at 42 & 89.

On October 10, 2013, the Board of Education voted to reinstate Saffold's employment and award back pay for the time he was on unpaid administrative leave. Doc. 47-1 at 42.  Upon reinstatement, Saffold worked at the Board of Education's central office on October 11, and thereafter at Central Elementary School in Mosses, Alabama. Doc. 47-1 at 42–43.  Dr. Boyd did not call the Hayneville Police Department to seek any additional information or to inform the police of the school board's decision to reinstate Saffold's employment. Doc. 47-1 at 35–36.  After that decision was made, Dr. Boyd intended to return Saffold to Hayneville Middle School. Doc. 47-1 at 43.  However, Dr. Boyd met with the student's mother and informed her of his decision, at which point she expressed disappointment and opposition to the proposal that Saffold return to the middle school. Doc. 47-1 at 43.  In response, Dr. Boyd decided to send Saffold to Central Elementary School. Doc. 47-1 at 43.  Hayneville Board of Education still employed Saffold when he was arrested at Central Elementary School on October 24, 2013, and until he resigned on October 30, 2013 at Dr. Boyd's urging due to the negative publicity surrounding the incident. Doc. 47-1 at 47 & 95.  Saffold was later charged with sexual abuse and enticing a child. Doc. 41-12.  On April 4, 2014, Saffold pleaded guilty to one count of enticement of a child for immoral purposes, a felony offense. Doc. 46-12 at 5.

C.     **Chief Mitchell's Investigation**

Chief Mitchell first learned about the incident at Hayneville Middle School on Thursday, October 3, 2013, during a meeting with a DHR employee concerning an unrelated matter. Doc. 46-3 at 23 & 25.  He was "bothered" that he learned of the incident

from DHR and not from a school official. Doc. 46-3 at 23.  At the time, Chief Mitchell mistakenly believed that Alabama law required a school official to notify the police of an allegation of abuse on school grounds.[1] Doc. 46-3 at 23.  Chief Mitchell then initiated a criminal investigation. Doc. 46-3 at 23.  On or around October 28, while Saffold was still in custody following his arrest, Chief Mitchell met with Dr. Boyd for the first time concerning the incident. Doc. 47-1 at 48.  During the meeting, Chief Mitchell told Dr. Boyd that he was conducting a criminal investigation into the incident and cautioned Dr. Boyd not to interfere. Doc. 46-3 at 24.  According to Dr. Boyd, Chief Mitchell said that he could "arrest [Dr. Boyd] right now." Doc. 47-1 at 48.  After assistant superintendent Jason Burroughs encouraged both men to "work together," Chief Mitchell apparently referenced a disagreement that occurred several years before over a potential contract between the Board of Education and the Hayneville Police Department for security at school athletic events. Doc. 41-2 at 16–17; Doc. 47-1 at 14.  At this meeting, Dr. Boyd had informed Chief Mitchell that the school board could not enter into a security contract with the Police Department because of an existing contract with the Sheriff's Department. Doc. 47-1 at 49. Chief Mitchell was allegedly insistent that the contract be awarded to the Hayneville Police Department and attempted to convince the rest of the Board of Education of his position, to no avail. Doc. 47-1 at 14–15.

---

[1] Section 26-14-3 of the Alabama Code requires school employees to report "immediately" any known or suspected instances of child abuse to a "duly constituted authority." Ala. Code § 26-14-3(a) (1975).  DHR is considered a duly constituted authority. *See* Ala. Code § 26-14-1(4) (1975).

After Saffold's arrest, Chief Mitchell conducted a criminal investigation into Dr. Boyd's response to the incident, and on April 10, 2014 he obtained a warrant for Dr. Boyd's arrest for the charge of reckless endangerment.[2] Doc. 46-1 at 2.  The warrant charged Dr. Boyd with "knowingly recklessly engag[ing] in conduct by placing Lee Saffold back into the Hayneville Middle School where 106 female students exist and Central Elementary School where 136 female students exist which created a substantial risk of serious physical injury to a total of 243 female students." Doc. 46-1 at 2.  However, because Central Elementary School is located in the town of Mosses, which is not within the jurisdiction of the Hayneville Police Department, a magistrate instructed Chief Mitchell to amend the warrant to remove the reference to Central Elementary School before Chief Mitchell executed it.[3] Doc. 46-3 at 37–38.  Chief Mitchell amended the warrant, and the new warrant for Dr. Boyd's arrest was issued on April 17, 2014, and read as follows:

> Daniel Boyd . . . did on or about September 30th and October 24, 2013, knowingly, recklessly engage in conduct by placing Lee Saffold back into the Hayneville Middle School where 108 female students attend which created a substantial risk of serious physical injury . . . in violation of [§] 13A-6-24.

Doc. 46-11 at 2.  Annie Robinson ("Magistrate Robinson"), a Certified Municipal Court Clerk and Magistrate since 2007, issued this warrant. Doc. 41-10.  In her affidavit, Magistrate Robinson testified that she issued the warrant because she determined there to

---

[2] Reckless endangerment is defined as "recklessly engag[ing] in conduct which creates a substantial risk of serious physical injury to another person." Ala. Code § 13A-6-24 (1975).

[3] Later, Chief Mitchell contacted Tommy Buford, the Chief of Police for Mosses, and requested that he obtain a warrant for Dr. Boyd's arrest based upon Saffold's time in Central Elementary School. Doc. 46-3 at 13–14.  It appears that Chief Mitchell believed this was within the realm of his authority because he was the Director of Public Safety in Mosses, where his role was to "advise [Chief Buford] if he needed." Doc. 46-3 at 15.

be probable cause for Dr. Boyd's arrest. Doc. 41-10.  Magistrate Robinson further testified that she would not have issued the warrant if she did not believe there was probable cause for the arrest. Doc. 41-10.

Chief Mitchell maintains that there were multiple bases for his conclusion that probable cause existed to arrest Dr. Boyd for reckless endangerment.  First, according to Chief Mitchell, he believed that Saffold remained at Hayneville Middle School for the "entire day" of the incident. Doc. 46-3 at 32.  The undisputed evidence demonstrates that Saffold remained at the school that day until approximately 1:30 p.m. Doc. 46-5 at 8–9. Chief Mitchell further testified that he believed Saffold returned to Hayneville Middle School immediately following the incident based on conversations with Chatman and the student's mother. Doc. 46-3 at 33–34.  He explained that the warrant covered the time period from September 30 to October 23, 2013, because "until the moment I arrested Lee Saffold on the Central Elementary School campus [on October 24], I don't know where Lee Saffold was." Doc. 46-3 at 35.  In fact, Chief Mitchell testified that "to this day," he believes Saffold returned to Hayneville Middle School between September 30 and October 23. Doc. 46-3 at 36.  Chatman testified that she was unsure if she saw Saffold at the school in the wake of the incident, but that she was told that he would be returning. Doc. 46-4 at 8.  She maintains that she told Chief Mitchell that she was not sure Saffold returned to the school, and that he would be "mistaken" in thinking that she had stated to him that Saffold did, in fact, return. Doc. 46-4 at 10.  According to Principal Williams, Saffold did not return to Hayneville Middle School after September 30. Doc. 46-5 at 10; Doc. 47-1 at 34–35.

During the investigation into Dr. Boyd's actions, Chief Mitchell had a conversation with Charlotte Tesmer, District Attorney for the Second Judicial Circuit, which includes Lowndes County. Doc. 46-3 at 27.  According to Chief Mitchell, Tesmer stated: "Chief, I think you've got probable cause, but I think you're going to have a hard time getting the conviction," to which Chief Mitchell responded that he would "leave that up to the courts." Doc. 46-3 at 27.  However, Tesmer maintains that she told Chief Mitchell that she did not believe there was probable cause to support an arrest warrant. Doc. 46-7 at 4–7. Specifically, she believed that the warrant was deficient because "you can't prove that, for example, a child was even around him or was even at school for those particular days." Doc. 46-7 at 4.  However, she stated that the District Attorney's office would prosecute Dr. Boyd if Chief Mitchell obtained an arrest warrant. Doc. 46-7 at 4.

## D.    Dr. Boyd's Arrest

On or around April 11, 2014, Dr. Boyd learned that Chief Mitchell intended to arrest him at a Board of Education meeting. Doc. 47-1 at 50.   Kelvin Lawrence ("Mayor Lawrence"), Hayneville's mayor, opposed Chief Mitchell's plan to arrest Dr. Boyd at the meeting—not because he opposed the arrest generally, but because he opposed arresting a "community leader" in that manner, and instead thought that Dr. Boyd should be allowed to turn himself in. Doc. 46-8 at 7 & 9–10.   Mayor Lawrence attended the meeting and, afterward, observed Chief Mitchell in the parking lot in the vicinity of Dr. Boyd. Doc. 46-8 at 7.  Once Chief Mitchell reiterated his intention to arrest Dr. Boyd, Mayor Lawrence said "you don't need to do that." Doc. 46-8 at 7.  Chief Mitchell responded that the only way he could be prevented from arresting Dr. Boyd would be for Mayor Lawrence to

"relieve[] him of his duties as chief of police." Doc. 46-8 at 7.  As a result, Mayor Lawrence temporarily suspended Chief Mitchell by declaring that he was "no longer chief of police of the City of Hayneville." Doc. 46-8 at 7.

The following week, the Mayor and Town Council held a regularly scheduled meeting during which they discussed Chief Mitchell's status in an executive session. Doc. 46-8 at 9.  While no council vote was held, Mayor Lawrence and the councilmembers agreed that Chief Mitchell should be reinstated on the condition that he allow Dr. Boyd to self-surrender. Doc. 46-8 at 9 & 14.  As chief executive of the town, Mayor Lawrence was Chief Mitchell's direct supervisor and was ultimately responsible for any decision regarding his employment status. Doc. 46-8 at 5 & 7; Doc. 46-10 at 8; Docs. 43-4 to 43-8.

Chief Mitchell was hired as the Chief of the Hayneville Police Department in 2004. Doc. 46-3 at 5.  He had approximately eight years of law enforcement experience before his appointment, including three and a half years as a deputy sheriff and three and a half years as a narcotics agent for Lowndes County's Drug Task Force. Doc. 46-3 at 5.  He attended the police academy in 1997 and accrued 480 hours of training. Doc. 46-3 at 6.  He had also attained training while employed as a deputy sheriff and narcotics agent. Doc. 46-3 at 5–6.  Prior to applying to become a law enforcement officer in 1997, Chief Mitchell had been arrested on two occasions. *See* Doc. 46-13.  One arrest arose out of a dispute with his wife in 1986 during which there was "push[ing] and shov[ing]" and he admittedly made verbal threats. Doc. 46-13 at 18–19.  A charge of menacing was later dropped. Doc. 46-13 at 19.  In 1990, he was arrested after a dispute at a night club, for which he was fined $100. Doc. 46-13 at 15.

12

When Mayor Lawrence was first elected, he told Chief Mitchell that he would rely on him to direct Hayneville's police operations and to keep him informed before a decision was made if "anything major [came] up." Doc. 46-8 at 5.  Although Mayor Lawrence did not agree with the decision to arrest Dr. Boyd during a public meeting, he did not voice any opposition to the arrest itself and did not discuss the details of the evidence against Dr. Boyd with Chief Mitchell. Doc. 46-8 at 11.  Instead, their conversation on the topic consisted of Chief Mitchell's representations that the investigation established probable cause for Dr. Boyd's arrest and that District Attorney Tesmer did not have a problem with Chief Mitchell "moving forward . . . with arresting Dr. Boyd." Doc. 46-8 at 11.  Mayor Lawrence testified that he thought it was not his place to prevent Chief Mitchell from making an arrest if Chief Mitchell believed that he had probable cause to do so. Doc. 46-8 at 6.

Mayor Lawrence discussed Chief Mitchell's plan to arrest Dr. Boyd with District Judge Adrian Johnson on April 10, 2014, the same day as the school board meeting at which Chief Mitchell attempted to make the arrest. Doc. 46-8 at 12.  Judge Johnson informed the Mayor that District Attorney Tesmer did not support Dr. Boyd's arrest, contrary to what Chief Mitchell had told the Mayor. Doc. 46-8 at 11–12.  According to Mayor Lawrence, Judge Johnson stated that he did not believe Dr. Boyd would be convicted if the case went to trial. Doc. 46-8 at 12.  However, Judge Johnson's recollection is that he informed Mayor Lawrence that he did not believe there was probable cause for Dr. Boyd's arrest because:

> there is no way that, under the fact pattern . . . that relocating someone who
> had been charged with the charge that I believe Mr. Saffold had been charged
> with, to another school could in any way lead to serious physical injury as is
> defined under Alabama law, which is defined under § 13A-1-2.

Doc. 46-9 at 5.  In essence, because reckless endangerment requires conduct "which creates a substantial risk of serious physical injury," *see* Ala. Code § 13A-6-24 (1975), "the facts [did] not fit the elements of the crime." Doc. 46-9 at 5.

### E.    Dr. Boyd's Criminal Proceedings

Dr. Boyd eventually turned himself in to Hayneville police in April of 2014. Doc. 47-1 at 53.  He estimated that he paid $7,800[4] to be released on bond and returned home the same night. Doc. 47-1 at 58.  Dr. Boyd took several days off from work, but returned between his arrest and his criminal trial. Doc. 47-1 at 59.  On February 24, 2015, Dr. Boyd was adjudicated not guilty of reckless endangerment. Doc. 46-12 at 4; Doc. 47-1 at 63. After a non-jury trial, the judge concluded that Dr. Boyd "did not engage in reckless conduct" because he complied with the reporting requirements established by Alabama law, placed Saffold on administrative leave, and acted "promptly and responsibly in obtaining the resignation of Mr. Saffold within one week of his arrest." Doc. 46-12 at 4–5.

## IV.  DISCUSSION

Dr. Boyd alleges the following federal claims pursuant to 42 U.S.C. § 1983: false arrest and false imprisonment against Chief Mitchell, the councilmembers, and the Town; "Policy of Inadequate Monitoring and Supervision" against the councilmembers and the

---

[4] The record evidence indicates that Dr. Boyd's bond was actually $5,400. Doc. 46-11 at 2; Doc. 46-12 at 5.

Town; and "Custom of Police Abuse," "Custom of Deliberate Indifference Relating to Hiring," and "Deliberate Indifference to Repeated Complaints" against the Town alone. Doc. 32 at 7–11.  Dr. Boyd asserts a claim for civil conspiracy pursuant to 42 U.S.C. § 1985 against all defendants.

The court notes that counts 3 through 6 of Dr. Boyd's Amended Complaint do not constitute separate causes of action under § 1983, but instead serve as potential theories of § 1983 liability for the Town's alleged violation of his Fourteenth Amendment rights. *See, e.g.*, *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (referring to the "failure to train or supervise" as a "basis for liability under § 1983"); *Jackson v. Mun. of Selma*, 2011 WL 833982, at *1 n.2 (S.D. Ala. Mar. 4, 2011) (concluding, where the plaintiff had asserted nearly identical claims to Dr. Boyd's, that "the quoted claims are but theories by which the plaintiff seeks to hold the City liable for any constitutional violation").  In any event, Dr. Boyd has abandoned all theories of liability asserted in counts 3 through 6 except his "Inadequate Monitoring and Supervision" claim against the Town by failing to defend these claims in his summary-judgment response.

Dr. Boyd also brings a number of claims under state law, including invasion of privacy, negligence, three counts of malicious prosecution, abuse of legal process, and "Violation of the Alabama Constitutions [sic] Equal Protection Clause" against all Defendants; wantonness and outrage against Chief Mitchell and the councilmembers; "negligent, careless, and unskillful hiring" against the Town; and libel and slander against

Chief Mitchell.[5]

## A.   Abandoned Claims

Defendants draw the court's attention to a number of claims asserted in Dr. Boyd's Amended Complaint that Dr. Boyd did not address in any substantial way in his response to the summary-judgment motions.   They contend that any claims not included in Dr. Boyd's response should be deemed abandoned and that summary judgment should therefore be entered in their favor. *See* Doc. 50 at 8; Doc. 51 at 2.   A plaintiff abandons claims by failing to address them meaningfully in a summary-judgment response brief. *See Brackin v. Anson*, 585 F. App'x 991, 994–95 (11th Cir. 2014) (holding that the plaintiff abandoned claims by failing to "make any argument based on relevant legal authority, or identify any material issues of fact" in his response after the defendant moved for summary judgment); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is on the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."); *Exford v. City of Montgomery*, 887 F. Supp. 2d 1210, 1220 (M.D. Ala. 2012) (deeming abandoned all claims the plaintiff "refused to defend" in response to a motion for summary judgment).

Accordingly, the court deems the following claims brought in Dr. Boyd's Amended Complaint to be abandoned: counts 4 through 6 ("Custom of Police Abuse," "Custom of

---

[5] Dr. Boyd refers to a state-law false imprisonment claim in his response (Doc. 47 at 25–26), but asserts no such claim in his Amended Complaint. *See* Doc. 32 at 12–23.  Dr. Boyd "may not amend [his] complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).  Therefore, the court will not entertain Dr. Boyd's attempt to assert a claim of false imprisonment under Alabama law.

Deliberate Indifference Relating to Hiring," and "Deliberate Indifference to Repeated Complaints"); count 7 ("Section 1985 Civil Conspiracy"); count 12 ("Tort of Outrage"); count 16 ("Abuse of Legal Process"); count 17 ("Violation of the Alabama Constitutions [sic] Equal Protection Clause"); counts 9 and 10 ("Negligence" and "Wantonness") as to Chief Mitchell; and count 3 ("Policy of Inadequate Monitoring and Supervision") as to the councilmembers.   While the court acknowledges that Dr. Boyd refers to some of these claims in the first paragraph of the "argument" section of his response brief, he offers no substantive legal argument with respect to any of them. *See generally* Doc. 47.   Therefore, the court recommends that summary judgment be entered for the councilmembers on count 3, the Town on counts 4 through 6, Chief Mitchell on counts 9 and 10, the councilmembers and Chief Mitchell on count 12, and all Defendants on counts 7, 16, and 17.

Additionally, the court concludes that Dr. Boyd has abandoned his state-law invasion of privacy claim.   In the Amended Complaint, Dr. Boyd avers that Defendants "intruded upon the solitude or seclusion of the Plaintiff by invading his emotional sanctum." Doc. 32 at 12.   Invasion of privacy in Alabama

> consists of four limited and distinct wrongs: (1) intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiff's personality for a commercial use.

*Johnston v. Fuller*, 706 So. 2d 700, 701 (Ala. 1997).   "Each of these categories of invasion of privacy has distinct elements, and each category establishes a separate privacy interest that may be invaded." *S.B. v. Saint James Sch.*, 959 So. 2d 72, 90 (Ala. 2006).   Dr. Boyd

asserts the intrusion-into-seclusion theory in his Amended Complaint, but states in his summary-judgment response that he "focuses his invasion of privacy claim on publicity which put [Dr. Boyd] in a false light to the public"—another theory entirely. Doc. 46 at 27. Defendants moved for summary judgment on the intrusion-into-seclusion theory asserted in the Amended Complaint. *See* Docs. 42 at 20–22 & 44 at 38–39.  Dr. Boyd has offered no argument in response to Defendants' summary-judgment motions on this theory. *See* Doc. 46 at 27. Dr. Boyd is not permitted to "constructively amend [his] complaint by raising new claims in a brief in opposition to summary judgment," and he has offered no response to Defendants' motion for summary judgment on the intrusion-into-seclusion theory. *Howell v. Morrison Mgmt. Specialists, Inc.*, 2013 WL 6568935, at *34 (N.D. Ala. Dec. 13, 2013).  As a result, the court concludes that Dr. Boyd has abandoned his invasion of privacy claim. *See id.* (concluding that the plaintiff failed to give the defendant fair notice of her claim against it where she asserted new theories of invasion of privacy in her response to the defendant's summary-judgment motion on a new set of facts).  The court thus recommends that summary judgment be entered in favor of Defendants on Dr. Boyd's invasion of privacy claim.

## B.   Claims Against the Councilmembers

### 1.   Section 1983

The sole remaining claims against the councilmembers pursuant to § 1983 allege false arrest and false imprisonment.  Specifically, Dr. Boyd claims that he suffered a violation of his rights under the Fourth and Fourteenth Amendments when he was arrested and detained pursuant to an invalid warrant. Doc. 32 at 7–8.  Because Dr. Boyd was arrested

pursuant to a warrant, the court construes counts 1 and 2 as a claim for malicious prosecution under § 1983. *See, e.g.*, *Carter v. Gore*, 557 F. App'x 904, 906 (11th Cir. 2014) ("The issuance of a warrant—even an invalid one as [plaintiff] alleges was issued here— constitutes legal process, and thus, where an individual has been arrested pursuant to a warrant, his claim is for malicious prosecution rather than false arrest.").

### a.   Official-Capacity Claims

Dr. Boyd's official capacity claims against the councilmembers may be summarily resolved.  "[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the [governmental entity for which the named individual serves]." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Dr. Boyd's § 1983 claims against the councilmembers in their official capacities are tantamount to claims against the Town, yet the Town has been made a proper defendant to this action.  Dr. Boyd's § 1983 claims against these defendants in their official capacities are thus duplicative and due for summary judgment. *See, e.g.*, *Brown v. Neumann*, 188 F.3d 1289, 1290 n.1 (11th Cir. 1999); *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991); *Summers v. City of Dothan, Ala.*, 2009 WL 230128, at *1 (M.D. Ala. Jan. 30, 2009) (dismissing official-capacity claims against police chief as duplicative of claims against the city).[6]

### b.   Individual-Capacity Claims

The councilmembers argue that they are entitled to qualified immunity for all § 1983

---

[6] Alternatively, the § 1983 claims against the councilmembers in their official capacities fail as a matter of law because the councilmembers, in their official capacities, are not "persons" subject to liability for monetary damages under § 1983. *See, e.g.*, *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989) (holding that state officials acting in their official capacities are not "persons" under § 1983).

claims brought against them in their individual capacities. Doc. 44 at 21.   Qualified immunity shields government officials performing discretionary functions from suit "in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (citation and internal quotation marks omitted).   Its purpose is to balance the need to hold public officials accountable for conduct that is clearly unlawful while at the same time shielding them from harassing lawsuits when they have acted reasonably. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

To be entitled to qualified immunity, a "public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).   If the public official has done so, the burden shifts to the plaintiff to demonstrate that qualified immunity is inappropriate. *Dalrymple*, 334 F.3d at 995.   To satisfy this burden, the plaintiff must demonstrate that the defendant committed a violation of a constitutional right and that this right was "clearly established" at the time of the alleged violation. *Carollo v. Boria*, 833 F.3d 1322, 1328 (11th Cir. 2016).   The court may address these requirements in any order, and in the instant analysis the court will discuss whether a constitutional violation occurred before looking to whether the constitutional right allegedly violated was "clearly established." *Id.*

Dr. Boyd offers no meaningful argument in response to the councilmembers' claim that they are entitled to qualified immunity.   Instead, he argues against qualified immunity

only for Chief Mitchell and the Town.[7]   Nevertheless, the court will undertake an independent review of the evidence to determine whether the councilmembers are entitled to qualified immunity on Dr. Boyd's federal claims.

The sole basis for Dr. Boyd's claims against the councilmembers is that they were partially responsible for the decision to reinstate Chief Mitchell after Mayor Lawrence placed him on administrative leave.  Specifically, Dr. Boyd claims that the Town Council and Mayor met about Chief Mitchell's suspension and agreed to reinstate Chief Mitchell if he would allow Dr. Boyd to surrender to police. Doc. 46 at 11.  Since the councilmembers knew about Chief Mitchell's intention to arrest Dr. Boyd, the argument goes, they bear responsibility for that arrest after agreeing to reinstate his employment.   The councilmembers therefore claim that it is undisputed that they acted within their discretionary authority when the alleged constitutional violation occurred—a contention with which the court agrees.

However, even viewing the evidence in the light most favorable to Dr. Boyd, there is nothing to suggest that the councilmembers violated any of Dr. Boyd's constitutional rights.  The uncontroverted evidence demonstrates that the councilmembers did not have the power to reinstate Chief Mitchell, and that the Mayor—not the Council—had supervisory authority over Chief Mitchell. *See* Doc. 44 at 12; Doc. 43-3 at 25; Docs. 43-5

---

[7] In both the Amended Complaint and his response to the motions for summary judgment, it is often difficult to divine Dr. Boyd's intent when he uses the generic term "Defendants."   However, in the qualified-immunity portion of his response, Dr. Boyd's argument focuses solely on Chief Mitchell's conduct and whether Chief Mitchell had arguable probable cause, which is one path to qualified immunity for an arresting police officer accused of a constitutional violation. *See, e.g.*, *Brown v. City of Huntsville*, 608 F.3d 724, 743 (11th Cir. 2010); Doc. 46 at 20–22.

to 43-8.  Moreover, during the relevant meeting, the Council did not hold a vote on Chief Mitchell's reinstatement, instead "le[aving] it to the mayor to make that ultimate decision as to what he was going to do with the chief after we discussed it [at the meeting]."  Doc. 43-3 at 7.  This deference to Mayor Lawrence was consistent with Alabama statutory authority granting mayors with "general supervision and control of all other officers and affairs of the city."  Ala. Code § 11-43-81 (1975).  Indeed, Dr. Boyd admits in his brief that the record evidence indicates that the Mayor made the decision to reinstate Chief Mitchell.  *See* Doc. 46 at 11 ("Daniels testified that they left the decision [to reinstate Chief Mitchell] to Mayor Lawrence.").  Reconciling this admission with the evidence exposes the faulty reasoning undergirding Dr. Boyd's § 1983 claim against the councilmembers.  If he does not base his claim on a decision by the Council in an area in which the Council had authority, then for all practical purposes Dr. Boyd asks the court to conclude that the councilmembers violated his constitutional rights by—at worst—merely thinking that Chief Mitchell should have been reinstated.  This Orwellian conversion of thought into tortious conduct has no basis in the law.  Furthermore, even if the councilmembers had voted for Chief Mitchell's reinstatement, the court would still find that they committed no constitutional violation because the councilmembers did not direct Chief Mitchell to arrest Dr. Boyd, nor did they bear any responsibility for Chief Mitchell's allegedly unconstitutional actions. *See* Docs. 43-5 to 43-8.

Even if the court were to ignore this fatal flaw, Dr. Boyd's attempt to strip the councilmembers of qualified immunity would fail at the second step of the analysis.  To demonstrate that the right allegedly violated was "clearly established," the plaintiff must

show that the public official was "on notice that his conduct would be clearly unlawful." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009). The plaintiff can demonstrate this notice by providing "materially similar" judicial precedent, pointing to a "broader, clearly established principle [that] should control the novel facts [of the] situation," or demonstrating that the conduct "so obviously violates th[e] constitution that prior case law is unnecessary." *Mercado v. City of Orlando*, 407 F.3d 1152, 1158–59 (11th Cir. 2005). Dr. Boyd has offered no such argument, and the court concludes that even if the councilmembers had committed a constitutional violation, they would not have been on notice that their conduct was clearly unlawful. The councilmembers have testified that they have no formal education or training in the law. *See* Docs. 43-5 to 43-8. Moreover, Chief Mitchell had already secured an arrest warrant. Indeed, no reasonable jury would conclude that the councilmembers, untrained in the law and without knowledge of all of the underlying facts, would be on notice of a constitutional violation when the town's top law enforcement officer merely sought to execute an arrest warrant duly issued by a neutral magistrate.

Thus, there is nothing before the court to suggest that the councilmembers would have had any notice that Chief Mitchell lacked probable cause to arrest Dr. Boyd or that the arrest would violate Dr. Boyd's Fourth Amendment rights. As a result, any constitutional violation would have been far from obvious. The court concludes that the councilmembers are entitled to qualified immunity and therefore recommends summary

judgment in their favor on all remaining claims under federal law.[8]

### 2. State-Law Claims

The state-law claims against the councilmembers that have not been abandoned are negligence, wantonness, and three counts of malicious prosecution.  The councilmembers assert that they are shielded from these claims by state-agent immunity.  In Alabama, state agents[9] are immune from suit in their personal capacities "when the conduct made the basis of the claim against the agent is based," among other things, upon the agent's "exercising his or her judgment in the administration of a department or agency of government, including . . . hiring, firing, transferring, assigning, or supervising personnel." *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000).   In *Cranman*, the Alabama Supreme Court established two exceptions for state-agent immunity: when (1) federal or state law requires otherwise; or (2) the state agent has acted "willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.* at 405.  Dr. Boyd invokes the second exception here. Doc. 46 at 30.  Dr. Boyd makes no argument regarding the councilmembers' claim to state-agent immunity, instead focusing his argument solely on Chief Mitchell.[10]

---

[8] Because the councilmembers are entitled to qualified immunity, the court need not address the merits of the § 1983 claims against them.  However, many of the same reasons that the councilmembers are entitled to qualified immunity, including insufficient factual allegations that they violated Dr. Boyd's constitutional rights, militate in favor of summary judgment on the merits of the § 1983 claims. *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 48 (1988) (establishing the violation of a federal constitutional or statutory right as one element of a § 1983 claim).

[9] Dr. Boyd makes no argument regarding the availability of state-agent immunity as a defense for the councilmembers, but "the Alabama Supreme Court has expressly held that state-agent immunity extends to municipal employees." *D.S. ex rel. Stinson v. Cnty. of Montgomery, Ala.*, 286 F. App'x 629, 637 n.9 (11th Cir. 2008) (citing *City of Birmingham v. Brown*, 969 So. 2d 910, 916 (Ala. 2007)).

[10] Despite the fact that Dr. Boyd has offered no argument regarding state-agent immunity for the councilmembers, the court addresses the merits of the councilmembers' argument to determine if they are

The court concludes that the councilmembers are entitled to state-agent immunity. First, there is no question that, to the extent the councilmembers have acted in a way that would subject them to liability under Alabama law, they did so "in the exercise of their judgment in executing their work responsibilities." *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002).  Of course, as already established, the councilmembers did not issue the warrant in question and had no supervisory authority over Chief Mitchell.  Therefore, the only basis for any of Dr. Boyd's state-law claims against the councilmembers is the strained logic that they are partially responsible for Chief Mitchell's reinstatement, and thus liable for his subsequent actions.  Notwithstanding the lack of a causal connection between the councilmembers' actions and Chief Mitchell's allegedly unconstitutional conduct, their actions were undertaken while exercising their "judgment in the administration of a department or agency of government." *Cranman*, 792 So. 2d at 405.

Second, Dr. Boyd has offered no argument or evidence that any of the councilmembers acted "willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Id.* at 392.  There is simply no evidence before the court to suggest that the councilmembers acted with the requisite mental state to strip them of state-agent immunity. For all of these reasons, the councilmembers are entitled to state-agent immunity, and the court recommends that summary judgment be entered in their favor on all remaining state-law claims against them.

---

entitled to state-agent immunity because state-agent immunity is an affirmative defense. *See, e.g.*, *Verret v. Ala. Dept. of Mental Health*, 511 F. Supp. 2d 1166, 1179 (M.D. Ala. 2007).

C.      **Claims Against the Town**

*1.*      *Section 1983*

Three constitutional claims under the Fourth and Fourteenth Amendments pursuant to § 1983 remain against the Town: false arrest, false imprisonment, and inadequate monitoring and supervision.  Defendants argue that counts 1 and 2 of the Amended Complaint are not brought against the Town.  *See* Doc. 44 at 19 n.7.  Due to the imprecise drafting of Dr. Boyd's Amended Complaint, it is indeed unclear whether the false arrest and false imprisonment claims have been asserted against the Town.  *See* Doc. 32 at 7 & 8.  Out of an abundance of caution, the court will operate under the assumption that he has asserted both claims against the Town, and will construe them as claiming malicious prosecution under § 1983.  At any rate, they are due for summary judgment in the Town's favor.

It is well established that a municipality is not subject to *respondeat superior* liability.  *E.g.*, *Snow ex rel. Snow v. City of Citronelle, Ala.*, 420 F.3d 1262, 1270–71 (11th Cir. 2005) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).  Instead, to state a claim against a municipality under § 1983, the plaintiff must allege that a "deprivation of constitutional rights occurred as a result of an official government policy or custom." *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)).  More specifically, "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v.*

*Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).  "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality," and a "custom is a practice that is so settled and permanent that it takes on the force of law." *Cooper*, 403 F.3d at 1221 (citing *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997)).  To demonstrate deliberate indifference to a constitutional right, the plaintiff must show "that a municipal actor disregarded a known or obvious consequence of his action." *Board of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 410 (1997).

Even if Dr. Boyd could prove a constitutional violation, all of his § 1983 claims against the Town fail because he has presented insufficient evidence of a policy or custom that caused that violation.  Dr. Boyd's argument for malicious prosecution relies on the allegation that Mayor Lawrence knew of Chief Mitchell's "bad intentions," yet still reinstated him after his suspension. Doc. 46 at 28.  However, those bad intentions were to arrest Dr. Boyd at a school board meeting—hardly an inherently and obviously unconstitutional act.  To hold the Town liable under § 1983, Dr. Boyd must demonstrate that Mayor Lawrence disregarded a known or obvious consequence of his decision either to hire Chief Mitchell or to reinstate him after the suspension.  However, the record evidence does not indicate that Mayor Lawrence has any formal legal training.  Quite reasonably, the Mayor left the decision on whether to arrest Dr. Boyd to Chief Mitchell.  *See* Doc. 46-8 at 6 (stating that "it wasn't my job" and "I never tried to stop him from doing his job" when asked whether Mayor Lawrence believed he had the responsibility to dictate whether Chief Mitchell arrested Dr. Boyd).

27

Dr. Boyd also claims that, during an informal discussion with Judge Johnson, Mayor Lawrence was informed that both Judge Johnson and District Attorney Tesmer opposed Dr. Boyd's arrest. Doc. 46 at 28. Mayor Lawrence testified that he had a discussion with Judge Johnson at his home for approximately 15 minutes during which Judge Johnson said that he did not think, based on what he knew at the time, that "Dr. Boyd [has a chance of] being convicted if [the case] goes to court." Doc. 46-8 at 12. Judge Johnson, on the other hand, testified that he told Mayor Lawrence that he did not believe there was probable cause to arrest Dr. Boyd for reckless endangerment because he did not believe that the elements of the crime were satisfied by the facts of the situation as he understood them. Doc. 46-9 at 5. Mayor Lawrence's more succinct, rudimentary recollection of the conversation is consistent with his lack of legal training and expertise—without which it would not have been obvious to Mayor Lawrence that an arrest would violate Dr. Boyd's Fourth Amendment rights. Mayor Lawrence also testified that Judge Johnson represented to him that District Attorney Tesmer was not supportive of the arrest since "she didn't really have anything to do with it, because it was in the Town of Hayneville . . . . in municipal court." Doc. 46-8 at 12. This lukewarm response is far removed from a definitive legal opinion. Under the circumstances, Judge Johnson's and Tesmer's hesitancy did not put Mayor Lawrence on notice that Chief Mitchell's arrest of Dr. Boyd would be a constitutional violation. The court thus concludes that a violation of Dr. Boyd's constitutional rights was not a known or obvious consequence of the Mayor's decision to reinstate Chief Mitchell. *See Brown*, 520 U.S. at 410.

With regard to Dr. Boyd's inadequate monitoring and supervision claim, "even a

city that did fail to adequately train or supervise police officers would not automatically be liable under 42 U.S.C. § 1983 if one of its police officers committed a constitutional tort." *Owaki v. City of Miami*, 491 F. Supp. 2d 1140, 1158 (S.D. Fla. 2007).  As the Eleventh Circuit explained in *Gold v. City of Miami*,

> there are only "limited circumstances" in which an allegation of a failure to train or supervise can be the basis for liability under § 1983 . . . . The Supreme Court has instructed that these "limited circumstances" occur only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights.

*Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *City of Canton v. Harris*, 489 U.S. 378 (1989)).  In order to show a municipality's deliberate indifference to its residents' constitutional rights, the plaintiff "must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Id.*  A municipality may be put on notice in two ways: (1) the municipality is aware of a pattern of constitutional violations but fails to provide adequate training, or (2) there is no evidence of prior incidents, but the "likelihood for constitutional violation is so high that the need for training would be obvious." *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1293 (11th Cir. 2009).

Dr. Boyd's inadequate monitoring and supervision claim against the Town centers on Mayor Lawrence's testimony that "he told Chief Mitchell that he did not know much about law enforcement so he would depend upon the Chief's leadership and to only let [the Mayor] know if something major happened." Doc. 46 at 11.  However, Dr. Boyd has not

demonstrated that the Town was aware of a pattern of constitutional violations or that there was even a likelihood of constitutional violations.   Mayor Lawrence's testimony demonstrates nothing more than the fact that he has no law enforcement experience and thus relied on Chief Mitchell, as Hayneville's top police officer, to manage the Town's law enforcement affairs.

Dr. Boyd also claims that Chief Mitchell's alleged past indiscretions; a "widespread pattern, practice, and custom of police abuse" in Hayneville; and "repeated complaints of constitutional violations" against Chief Mitchell and Hayneville police officers put the Town on notice of a "need for improved training or supervision." Doc. 32 at 8–11; *see also Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990).  However, Dr. Boyd has failed to offer evidentiary support for these allegations sufficient to survive summary judgment. There is no evidence before the court, aside from Dr. Boyd's unsubstantiated allegations, of a pattern, practice, or custom of police abuse in Hayneville, nor of any complaints of constitutional violations such that the Town would have been on notice of a need to closely monitor Chief Mitchell or any other member of the Hayneville Police Department.

The only evidence in support of the theory that the Town was deliberately indifferent to its residents' constitutional rights is the fact that Chief Mitchell had been arrested on two occasions prior to becoming a law enforcement officer.[11] *See* Doc. 46-13.

---

[11] In his brief, Dr. Boyd also points to an alleged altercation in 2008 between Chief Mitchell and Chip Williams, then the Sheriff of Lowndes County, while Chief Mitchell was also employed by the Lowndes County Sheriff's Department. Doc. 46 at 11–12 & 29.  The disagreement concerned a case both Chief Mitchell and Sheriff Williams handled for the Drug Task Force, and took place in the presence of members of the District Attorney's office, including former District Attorney John Andrews. Doc. 46-3 at 7.  Chief Mitchell testified that Sheriff Williams, who is "like a brother" to him, threatened to kill him during the altercation, and Chief Mitchell responded by threatening to "kick his behind out [of a] window." Doc. 46-

In 1986, Chief Mitchell was arrested after a dispute with his wife during which there was "push[ing] and shov[ing]" and he made verbal threats. Doc. 46-13 at 18–19.  He was charged with menacing, but the charge was later dropped. Doc. 46-13 at 19.  In 1990, he was arrested after a dispute at a night club, for which he was fined $100. Doc. 46-13 at 15.  He later applied to be a police officer in Lowndes County, Alabama. Doc. 46-13 at 24.  However, there is no record evidence to suggest that, after Chief Mitchell had attained the requisite training and qualifications to be approved by the Alabama Peace Officers Standards and Trainings Commission, two misdemeanor arrests from several years prior would put the Town on notice of a specific need to monitor or supervise Chief Mitchell in a manner different from any other chief of police in another jurisdiction.[12]  Put another way, Chief Mitchell's prior arrests would not necessarily lead to subsequent unconstitutional conduct.  "[W]ithout notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." *Gold*, 151 F.3d at 1351.  Accordingly, the court recommends summary judgment in favor of the Town on all Section 1983 claims against it.

---

3 at 7.  Chief Mitchell removed his service weapon from its holster and placed it on a windowsill to unarm himself before telling Sheriff Williams to "come on and do whatever [he] wanted to do." Doc. 46-3 at 7.  Criminal charges were filed and later dismissed against both men. Doc. 46-3 at 7.  Dr. Boyd references this incident in the legal argument for his state-law negligent hiring claim, but not for his federal claims. *See* Doc. 46.  Dr. Boyd offers no argument, nor any evidence, as to how this incident would have put the Town on notice of a specific need to train or supervise in a particular area relevant to this lawsuit.

[12] Chief Mitchell testified that he had approximately eight years of law enforcement experience before being appointed the Chief of Police for Hayneville in 2004. Doc. 46-3 at 5.  He attended the police academy in 1997 and accrued 480 hours of training. Doc. 46-3 at 6.  He also attained training while employed by the Lowndes County Sheriff's Department and Drug Task Force. Doc. 46-3 at 5–6.  He is certified as a criminal investigator, homicide investigator, and narcotics investigator. Doc. 46-3 at 6.

### 2.    *State-Law Claims*

Though he abandoned several state-law claims, Dr. Boyd continues to assert causes of action for negligence, negligent hiring, and malicious prosecution under Alabama law. To the extent Dr. Boyd asserts a claim of wantonness against the Town (*see* Doc. 32 at 14), that claim fails as a matter of law. *See* Ala. Code § 11-47-190 (limiting a municipality's potential liability to negligent conduct); *Town of Loxley v. Coleman*, 720 So. 2d 907, 909 (Ala. 1998) ("This court has construed § 11-47-190 to exclude liability for wanton misconduct."). The court concludes that summary judgment should be entered in favor of the Town on all three of Dr. Boyd's state-law malicious-prosecution claims for the same reason. *See, e.g.*, *Howard v. City of Demopolis, Ala.*, 984 F. Supp. 2d. 1245, 1261–62 (S.D. Ala. 2013) (holding that, under § 11-47-190, a municipality cannot be found liable for malicious prosecution because it is an intentional tort).

### a.    **Negligence**

Dr. Boyd appears to argue that the Town is vicariously liable for Chief Mitchell's alleged negligence based on a theory of *respondeat superior*, as well as directly liable on the basis of the conduct of the Mayor and councilmembers.[13] The Town argues that it cannot be held vicariously liable for Chief Mitchell's conduct because his acts were intentional. Doc. 44 at 34. In response, Dr. Boyd offers no argument to rebut the Town's

---

[13] Again, Dr. Boyd's Amended Complaint is imprecise. There is no question that he argues for vicarious liability by stating that the "Town is thus responsible for negligent acts and omissions of its agent Police Chief." Doc. 32 at 13. However, in the very next paragraph, he also claims that the "Town of Hayneville's acts and omissions regarding [Dr. Boyd] constituted negligence." Doc. 32 at 13. Therefore, the court will operate under the assumption that Dr. Boyd has asserted a negligence claim against the Town under both direct and vicarious liability theories.

contention. Doc. 46 at 26–27.   Instead, Dr. Boyd advances a theory of direct liability, arguing that the "Town of Hayneville and council members certainly engaged in conduct that was carried on with a reckless or conscious disregard of the rights and safety of Dr. Boyd." Doc. 46 at 26.

The court concludes that the Town is not liable for negligence under a *respondeat superior* theory.   First, because Dr. Boyd asserts *respondeat superior* in the Amended Complaint (*see* Doc. 32 at 13), but not in his response to the Town's summary-judgment motion, he has abandoned this theory of liability.   Moreover, even if the court did not recognize the abandonment of Dr. Boyd's *respondeat superior* argument, this claim is barred by law.  In Alabama, a municipality is immune from the damage caused by its agents unless the damage resulted from the agent's "neglect, carelessness, or unskillfulness." Ala. Code § 11-47-190; *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 742–43 (11th Cir. 2010).   In an unpublished decision, the Eleventh Circuit has held that, where the facts demonstrated "intentional conduct, the City is entitled to immunity under § 11-47-190." *Fowler v. Meeks*, 569 F. App'x 705, 708 (11th Cir. 2014).   Federal and state courts in Alabama have routinely joined in this holding. *See Anderson v. City of Homewood*, 2016 WL 7438895, at *6 (N.D. Ala. Dec. 27, 2016) ("Thus, to the extent plaintiff alleges a state-law claim against the City of Homewood based upon intentional . . . conduct by its employees, the City is not liable."); *Ex Parte Labbe*, 156 So. 3d 368, 374 (Ala. 2014) ("[B]ecause the City cannot be held liable for wanton or intentional conduct, it is likewise immune from suit for those claims asserted by the plaintiffs alleging wanton and/or intentional conduct by the City."); *Todd v. Kelley*, 783 So. 2d 31, 42–43 (Ala. Civ. App.

2000) (holding that § 11-47-190 immunity applied because the "acts as alleged in [the] complaint were purely intentional; there were no facts supporting a negligence theory of recovery"). Thus, Dr. Boyd cannot assert a claim of *respondeat superior* liability for negligence against the Town because the underlying conduct was intentional.

Dr. Boyd next contends that the Town acted negligently in its "supervision, monitoring, and reinstating of Police Chief Mitchell after he was suspended." Doc. 32 at 13. Specifically, Dr. Boyd claims that because Mayor Lawrence knew that Chief Mitchell intended to arrest Dr. Boyd at the council meeting even though Judge Johnson told the Mayor "in no uncertain terms that there was no probable cause," the Town should be liable for negligence. Doc. 46 at 26–27. Of course, as stated earlier, whether the conversation between Mayor Lawrence and Judge Johnson led to the certain conclusion that there was no probable cause is in dispute due to the differing accounts of that conversation and Mayor Lawrence's lack of legal training and expertise.

Negligence in Alabama is defined as "the failure to do what a reasonably prudent person would have done under the same or similar circumstances." *Ford Motor Co. v. Burdeshaw*, 661 So. 2d 236, 238 (Ala. 1995). To prove a claim of negligence, the plaintiff must establish that the defendant owed the plaintiff a duty, the defendant breached that duty, and the breach damaged the plaintiff. *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 679 (Ala. 2001). Before liability for negligence can attach to a municipality, "[t]here must be either an underlying common law duty or a statutory duty of care with respect to the alleged tortious conduct." *Hilliard v. City of Huntsville*, 585 So. 2d 889, 890 (Ala. 1991). The Alabama Legislature has imposed a statutory duty of care

upon municipalities, declaring:

> No city or town shall be liable for damages for injury done to or wrong
> suffered by any person or corporation, unless said injury or wrong was done
> or suffered through the neglect, carelessness or unskillfulness of some agent,
> officer or employee of the municipality engaged in work therefor and while
> acting in the line of his duty[.]

Ala. Code § 11-47-190 (1975).  Thus, Mayor Lawrence—while engaged in work for the

Town and acting in the line of his duty—owed a duty of care to Dr. Boyd.

The court concludes that a factual dispute exists as to whether Mayor Lawrence

breached his duty of care when he decided to reinstate Chief Mitchell despite concerns

about the propriety of Chief Mitchell's intention to arrest Dr. Boyd.  The uncontroverted

evidence in the record demonstrates that Mayor Lawrence was well aware of Chief

Mitchell's intention to arrest Dr. Boyd, which is the reason he suspended Chief Mitchell in

the first place. Doc. 46-8 at 7.  At the very least, Mayor Lawrence had a conversation with

a sitting Circuit Court Judge in which the Judge expressed reservations about the legal basis

for the arrest. Doc. 46-8 at 12.  The Judge also suggested to Mayor Lawrence that District

Attorney Tesmer was not as supportive of the arrest as Chief Mitchell made her out to be,

which could have alerted Mayor Lawrence to the possibility that Chief Mitchell was

manipulating facts in order to justify the arrest. *See* Doc. 46-8 at 11.

Moreover, and perhaps most telling, Mayor Lawrence knew of Chief Mitchell's

adamancy in seeking to arrest Dr. Boyd at the school board meeting in front of an

abnormally large crowd. Doc. 46-8 at 7–8.  In fact, Chief Mitchell was willing to sacrifice

his job to make the arrest at the meeting, stating that the only way Mayor Lawrence could

prevent it would be to "relieve him of his duty as chief of police." Doc. 46-8.   Chief

Mitchell's insistence on arresting Dr. Boyd in such a public manner could tend to show that Chief Mitchell was motivated, at least in part, by animus toward Dr. Boyd. Thus, viewing the evidence in the light most favorable to Dr. Boyd, a reasonable factfinder could conclude that Mayor Lawrence was, or at least should have been, aware of Chief Mitchell's alleged malice toward Dr. Boyd, raising doubts as to the validity of the arrest. Yet Mayor Lawrence failed to intervene—and even greased the skids for Dr. Boyd's prosecution by reinstating Chief Mitchell. The court therefore finds that a jury could conclude that Mayor Lawrence breached his duty of care to Dr. Boyd and thus subjected the Town to liability for negligence. Accordingly, the court recommends that the Town's motion for summary judgment on Dr. Boyd's negligence claim be denied.

### b.   Negligent Hiring, Training, and Supervision

Alabama courts traditionally have been hesitant to find that negligent-hiring claims against municipalities are viable. *See, e.g.*, *Ott v. City of Mobile*, 169 F. Supp. 2d 1301 (S.D. Ala. 2001). However, courts in this district have concluded that, after the Alabama Supreme Court's decision in *Ex parte Montgomery*, 99 So. 3d 282 (Ala. 2012), negligent hiring against a municipality may be a viable theory of liability where the relevant discretionary activity is not performed by a law enforcement officer such that the claim would be barred by state-agent immunity. *E.g.*, *Ford v. City of Goodwater*, 2014 WL 37857, at *8 (M.D. Ala. Jan. 6, 2014); *see* Ala. Code § 6-5-338 (1975). In Alabama, to establish negligent hiring, training, and supervision, the plaintiff must demonstrate that the employee committed tortious behavior and that the defendant "had actual or constructive knowledge of that alleged incompetence." *Buckentin v. SunTrust Mortg. Corp.*, 928 F.

Supp. 2d 1273, 1288 (N.D. Ala. 2013).   Thus, to meet his burden, Dr. Boyd must demonstrate that the Town "actually knew, or should have discovered in the exercise of due diligence," Chief Mitchell's alleged incompetence. *Ford*, 2014 WL 37857, at *8 (quoting *Sanders v. Shoe Show, Inc.*, 778 So. 2d 820, 824 (Ala. Civ. App. 2000)).   This burden can be satisfied with specific evidence that Chief Mitchell's tortious behavior was brought to the attention of the Town, or that the "specific acts of incompetency" were of "such nature, character, and frequency" that the Town should have been aware of the conduct. *Thompson v. Havard*, 235 So. 2d 853, 858 (Ala. 1970).

Dr. Boyd has fallen fall short of meeting this burden.   In his summary-judgment response, he references Chief Mitchell's 1990 arrest arising out of a spousal dispute and the altercation between Chief Mitchell and Sheriff Williams in 2008. Doc. 46 at 28–29. Though Dr. Boyd offers little in the way of explanation, presumably these incidents comprise the "incompetence" that caused Chief Mitchell's later arrest of Dr. Boyd, allegedly in the absence of probable cause.   However, the Alabama Supreme Court has explained that "implicit in the tort of negligent hiring, retention, training, and supervision is the concept that, as a consequence of the employee's incompetence, the employee committed some sort of act, wrongdoing, or tort that *caused* the plaintiff's injury." *Jones Exp., Inc. v. Jackson*, 86 So. 3d 298, 305 (Ala. 2010).   In other words, the employee's alleged incompetence must have proximately caused the plaintiff's injury. *See id.*

Dr. Boyd has failed to demonstrate how the incompetence allegedly established by Chief Mitchell's 1990 arrest or his altercation with Sheriff Williams proximately caused the arrest that is the basis of his lawsuit.   Indeed, the record is devoid of any evidence of

complaints that Chief Mitchell abused his authority, demonstrated bias, or misapplied the law in the 16 years of his law enforcement experience.  Moreover, there is a dearth of evidence regarding the altercation between Chief Mitchell and Sheriff Williams other than Chief Mitchell's deposition testimony.  In fact, the only other evidence of record cited by Dr. Boyd is the deposition of Mayor Lawrence—which, in fact, contains no discussion of the incident—and Dr. Boyd's own deposition, in which he admits that he has no personal knowledge of the incident. *See* Doc. 47-1 at 100.  Dr. Boyd also states that he did not discuss the incident with Sheriff Williams, nor with any other eyewitness. Doc. 47-1 at 100–01.  Thus, the only direct evidence of the altercation is Chief Mitchell's recollection— and his story does little to cure Dr. Boyd's causation deficiency. Doc. 46-3 at 6–12. According to Chief Mitchell, he and longtime friend, Sheriff Chip Williams, engaged in a verbal altercation in 2008 regarding a drug case the two were handling for the Lowndes County Drug Task Force. Doc. 46-3 at 6–7.  During the altercation, Chief Mitchell and Sheriff Williams exchanged threats, then Chief Mitchell removed his service weapon and placed it on a nearby windowsill in order to disarm himself, telling Sheriff Williams to "come on and do whatever [he] wanted to do." Doc. 46-3 at 7.  Criminal charges were filed against both men. Doc. 46-3 at 7–8.  John Andrews, who was the District Attorney for the Second Judicial Circuit at the time, witnessed the incident and later dismissed the charges. Doc. 46-3 at 7–8.

While this altercation may call into question Chief Mitchell's patience or the wisdom of his strategy for resolving disagreements, it does not demonstrate a propensity for conduct in the course of his duties that would be tortious or unconstitutional.  Thus,

even if the court were to accept that the prior incidents establish the incompetence necessary to support a negligent hiring, training, and supervision claim, Dr. Boyd has failed to establish a proximate causal link between these incidents and the allegedly unconstitutional conduct.  This is particularly true when the alleged constitutional violation was not the product of a split-second decision made in the heat of the moment, but instead resulted from a protracted criminal investigation.  For these reasons, the court recommends that summary judgment be entered in favor of the Town on Dr. Boyd's state-law negligent hiring, training, and retention claim.

**D.    Claims Against Chief Mitchell**

   *1.    Section 1983*

      **a.    Official-Capacity Claims**

All § 1983 claims against Chief Mitchell in his official capacity are due to be dismissed because they are duplicative of claims against the Town already brought by Dr. Boyd. *See* Part IV.B.1.a.

      **b.    Individual-Capacity Claims**

Dr. Boyd brings claims against Chief Mitchell in his individual capacity for false arrest and false imprisonment pursuant to § 1983.  In essence, Dr. Boyd contends that his arrest constituted an unreasonable seizure in violation of the Fourth Amendment because no probable cause existed at the time of his arrest.  As stated previously, the court will construe Dr. Boyd's false arrest and false imprisonment claims against Chief Mitchell as a single claim for malicious prosecution under § 1983. *See, e.g.*, *Carter*, 557 F. App'x at 906.

"To establish a § 1983 malicious-prosecution claim, the plaintiff must prove two things: (1) the elements of the common law tort of malicious prosecution; and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures." *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1256 (11th Cir. 2010).  In Alabama, the elements for malicious prosecution are: (1) a judicial proceeding initiated by the present defendant; (2) with malice; but (3) without probable cause; (4) that terminated in the plaintiff's favor; and (5) caused damage to the plaintiff. *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003). Dr. Boyd has asserted three claims for malicious prosecution under Alabama law, which will be discussed below.  For the purposes of the § 1983 analysis, however, the court will first discuss *Grider*'s second prong through the lens of the qualified immunity analysis.

Generally, an arrest in the absence of probable cause is an unreasonable seizure in violation of the Fourth Amendment. *Grider*, 618 F.3d at 1256.  Thus, "the existence of probable cause defeats a § 1983 malicious-prosecution claim." *Id.*  "'Probable cause' is defined as 'facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.'" *Id.* at 1257 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)).  Knowledge "derived from reasonably trustworthy information" can serve as the basis for probable cause for law enforcement officials. *Id.*

Chief Mitchell, like the councilmembers and the Town, contends that he is entitled to qualified immunity.  The two-part qualified immunity test has already been discussed and need not be recited in its entirety here.  If the defendant was acting within the scope of his discretionary authority, the plaintiff must demonstrate that the defendant violated a clearly established constitutional right to strip the defendant of his qualified immunity. *See*

*id.* at 1254.   While the court must construe the facts in the light most favorable to the plaintiff, he still bears the burden of demonstrating the violation of a clearly established right. *See id.*

In analyzing qualified immunity for a malicious-prosecution claim, an officer needs to prove only arguable—not actual—probable cause to be entitled to qualified immunity. *Id.* at 1257.   "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff." *Id.* (internal quotation marks omitted).   The concept of arguable probable cause shields police officers from liability in instances in which they "reasonably but mistakenly" have concluded that probable cause exists. *Id.* (internal quotation marks omitted).   Furthermore, where—as here—there has been a "search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012).   However, while a warrant issued by a neutral magistrate often acts as a "shield of immunity," it does not guarantee qualified immunity. *Id.* at 547 (internal quotation marks omitted).   There is no immunity where "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Id.* (internal quotation marks omitted).   But this is a small class of cases since "[t]he threshold for establishing this 'narrow' exception" is "high." *Taylor v. Taylor*, 649 F. App'x 737, 744 (11th Cir. 2016) (quoting *Malley v. Briggs*, 475 U.S. 335, 346 n.9 (1986)).

While the parties' legal argument centers on the traditional probable cause standard, in the context of Dr. Boyd's § 1983 claim the court need only decide whether arguable probable cause for Dr. Boyd's arrest existed in light of the issuance of an arrest warrant by a neutral magistrate. There is a fine line between arguable and actual probable cause. Here, the court concludes that Dr. Boyd has failed to provide sufficient evidence that arguable probable cause is lacking. *See Messerschmidt*, 565 U.S. at 547. Under circumstances such as these, it is imperative that the court articulate clearly the facts that support a finding of arguable probable cause but do not necessarily establish actual probable cause.

The warrant at issue charges Dr. Boyd with a violation of Alabama's reckless endangerment criminal statute. Doc. 41-4. A person commits reckless endangerment if "he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person."[14] Ala. Code § 13A-6-24 (1975). The statute "does not require any particular person to be actually placed in danger, but deals with potential risks." Ala. Code § 13A-6-24 (Commentary).

Dr. Boyd's argument against probable cause depends on the contention that "two employees" told Chief Mitchell that Saffold had not returned to the school after the day of the incident. Doc. 46 at 20–21. Dr. Boyd offers no citation to the record on this point and

---

[14] The parties argue over whether sexual assault can lead to "serious physical injury" within the meaning of the statute. "Serious physical injury" is defined by the Alabama Criminal Code as "[p]hysical injury which creates a substantial risk of death, or which causes serious and protracted disfigurement, protracted impairment of health, or protracted loss or impairment of the function of any bodily organ." Ala. Code § 13A-1-2(14) (1975). Sexual assault, of course, can inflict significant long-term physical and psychological injuries, and the court concludes that such injuries could potentially fall within the "protracted impairment of health" clause of the Alabama Criminal Code's definition. Notably, Dr. Boyd's acquittal following his criminal trial was not based on the lack of a serious physical injury, but on the trial judge's conclusion that Dr. Boyd did not act recklessly. *See* Doc. 46-12.

does not name the employees.   The undisputed facts in the record demonstrate that the student reported at approximately 10:00 a.m. that Saffold had sexually assaulted her, but Saffold remained at the school until 1:30 that afternoon. Doc. 46-5 at 7–9.   After the incident was reported, Saffold entered Chatman's office while the student was present. Doc. 41-14 at 6.  The door to the office was closed and a sign was posted outside indicating that visitors were not permitted to enter, but Saffold entered anyway. Doc. 41-14 at 6. Chatman stated that Saffold had never before entered the room while she was with a student, that he appeared "nervous," and that it "seem[ed] like a sign of guilt at that point." Doc. 41-9 at 6 & 9.

Though Principal Williams then escorted Saffold to his office, told him not to leave, and "locked the door to the office so no one could come in," this only prevented entrance to the office, not Saffold's exit from it.  Principal Williams and Saffold did not leave the school until approximately 1:30 p.m., when they went to meet with Dr. Boyd. Doc. 41-14 at 7–8.   Additionally, Chief Williams believed, based on an alleged discussion with Chatman, that Saffold had returned to Hayneville Middle School "a day or two" after the incident. Doc. 41-2 at 33.  Chief Mitchell testified in his deposition that he still believes Saffold returned to Hayneville Middle School, which has been disputed by school officials. *See* Doc. 41-2 at 34; Doc. 46-5 at 10; Doc. 47-1 at 34–35.

Even viewing the evidence of record in the light most favorable to Dr. Boyd, the court concludes that Saffold's continued presence at the school on the day of the incident, his unauthorized entry into the guidance counselor's office while the student was present, and  Chief  Mitchell's  reasonable  (even  if  mistaken)  belief  that  Saffold  returned  to

Hayneville Middle School support a finding that arguable probable cause existed for a violation of Alabama's reckless endangerment statute.   Though Dr. Boyd and school officials may have complied with the reporting requirements established by Alabama law, Chief Mitchell could have believed that allowing Saffold to remain at the school on September 30, where he accessed Chatman's office while she was meeting with the victim, was reckless.   This conclusion is buttressed by Chief Mitchell's belief that Saffold returned to Hayneville Middle School.   Finally, the fact that the warrant in question was issued by a neutral magistrate is strong evidence that Chief Mitchell acted in an "objectively reasonable manner." *See Messerschmidt*, 565 U.S. at 546.   On the basis of the information he acquired from trustworthy sources, the record evidence establishes that Chief Mitchell reasonably—even if mistakenly—concluded that probable cause for Dr. Boyd's arrest existed, and it is not obvious that a reasonably competent police officer would have reached the opposite conclusion.

Therefore, Chief Mitchell is entitled to qualified immunity.   This conclusion does not equate to a finding that the arrest warrant was supported by actual probable cause, nor does it necessitate a definitive finding that Chief Mitchell acted without malice. *See Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997) ("[B]ecause only arguable probable cause is required, the inquiry is not whether probable cause actually existed, but whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed.").   Indeed, the standard is "broad enough to cover some mistaken judgment," *see id.* (internal quotation marks omitted), and "does not include an inquiry into the officer's subjective intent or beliefs." *Grider*, 618 F.3d at 1257.

Accordingly, the court recommends that summary judgment be entered in Chief Mitchell's favor on the § 1983 claims against him due to his qualified immunity.

### 2. *State-Law Claims*

#### a. **Malicious Prosecution**

Dr. Boyd asserts three separate malicious-prosecution claims against Chief Mitchell under Alabama law. Each claim is based on one of the three arrest warrants Chief Mitchell sought to obtain. The court concludes that the malicious-prosecution claims based on the first and third warrants fail as a matter of law because Chief Mitchell was not arrested pursuant to either of those warrants, and therefore Dr. Boyd cannot demonstrate the "judicial proceeding" or "damage" necessary to support a cause of action for malicious prosecution based on those two warrants. *See Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 831–32 (Ala. 1999) (listing a prior judicial proceeding and damages as necessary elements of a successful malicious-prosecution claim). The court recommends summary judgment for Chief Mitchell on both claims.

Chief Mitchell did arrest Dr. Boyd on the second arrest warrant, but Chief Mitchell's motion for summary judgment on even this malicious-prosecution claim is due to be granted. Chief Mitchell contends that he is entitled to state-agent and discretionary-function immunity under Alabama law. Doc. 42 at 28–30. As stated above, state agents generally are entitled to immunity in the exercise of their judgement or discretion in performing work-related responsibilities. *See Ex Parte Cranman*, 792 So. 2d at 405. There is no immunity, however, where the state agent acted in bad faith, beyond his authority, or under a mistaken interpretation of the law. *See id.*

Additionally, Alabama law provides statutory immunity for law enforcement officers performing discretionary functions, known as "discretionary-function immunity." *Grider*, 618 F.3d at 1255; *see also* Ala. Code § 6-5-338(a) (1975) ("Every peace officer . . . shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."). The *Cranman* burden-shifting test for state-agent immunity also applies to Alabama's discretionary-function immunity. *Grider*, 618 F.3d at 1255 (citations omitted). Thus, the police officer must first demonstrate that he was performing a discretionary function within the scope of his law enforcement duties. *Id.* This portion of the analysis was described by the Alabama Supreme Court in *Hollis v. City of Brighton*:

> A state agent shall be immune from civil liability . . . when the conduct made the basis of the claim against the agent is based upon the agent's . . . exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala. Code 1975.

*Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006). If the officer can meet this showing, the burden shifts to the plaintiff to show that the officer acted "willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Grider*, 618 F.3d at 1255–56 (citations omitted). This standard requires the plaintiff to demonstrate that the defendant's actions were "so egregious as to amount to willful or malicious conduct or conduct engaged in in bad faith, by, for example, showing that the defendant had a personal ill will against the plaintiff and that he maliciously or in bad faith arrested him solely for purposes of harassment." *Ex parte Tuscaloosa Cnty.*, 796 So. 2d 1100, 1107 (Ala. 2000)

(citation and internal quotation marks omitted).

The Eleventh Circuit has explained that "[t]he Alabama Supreme Court has applied the same 'arguable probable cause' standard utilized in this Court's federal qualified immunity cases for determining whether a city police officer receives state-agent immunity for his role in an arrest." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 743 (11th Cir. 2010) (citing *Borders v. City of Huntsville*, 875 So. 2d 1168, 1180 (Ala. 2003)).  This is significant, of course, because the court has concluded that Chief Mitchell had arguable probable cause to arrest Dr. Boyd.  Since the Alabama Supreme Court's opinion in *Borders*, courts in the Eleventh Circuit have applied the arguable-probable-cause standard to their discretionary-function immunity analysis in state-law malicious-prosecution claims against police officers. *See, e.g.*, *Grider*, 618 F.3d at 1259 ("Because *Grider*'s version of events shows lack of arguable probable cause and malice, Officer Carver is not entitled to Alabama's discretionary-function immunity."); *Paulin v. City of Loxley, Ala.*, 171 F. App'x 773, 778 (11th Cir. 2006) (holding that "[b]ecause arguable probable cause existed, [the defendant] is entitled to discretionary function immunity on [the plaintiff's] state law claims based on false arrest and malicious prosecution," and stating that *Borders* adopted the concept of arguable probable cause in discretionary-function immunity cases); *Williams v. City of Abbeville*, 2013 WL 11117297, at *8 (M.D. Ala. Mar. 28, 2013) (stating that the "facts are sufficient to infer malice on [the defendant's] part and to show that he lacked arguable probable cause in seeking the arrest warrant," and therefore he "is not entitled to state-agent immunity on the state-law malicious-prosecution claim").

In *Borders v. City of Huntsville*, the Alabama Supreme Court faced a state-law malicious-prosecution claim arising out of a warrantless arrest. The plaintiff in that case alleged, among other things, that the defendant police officer did not have probable cause for his warrantless arrest because the officer did not personally witness the commission of a crime. *Borders*, 875 So. 2d at 1177. The defendant police officer claimed he was entitled to discretionary-function immunity. *Id.* However, the plaintiff never contended that the police officer acted in bad faith, as Dr. Boyd does here, and instead claimed that he was merely negligent, careless, or unskillful in effectuating the warrantless arrest. *Id.* at 1178. To determine discretionary-function immunity, the court asked "only whether [the] officer was performing a discretionary function with respect to the incident in question." *Id.* Thus, the court's analysis centered on the discretionary-function prong of the immunity test, and never addressed (nor needed to address) the bad-faith prong. Specifically, the court concluded that, if the plaintiff committed a misdemeanor in the police officer's presence, "it would logically follow that [the officer] would be entitled to discretionary-function immunity." *Id.* at 1179. However, in such a case, the issue of immunity "would never come into play" because the officer would have had probable cause to make an arrest— and thus would not be subject to tort liability in the first place. *Id.* (quoting *Telfare v. City of Huntsville*, 841 So. 2d 1222, 1230 (Ala. 2002) (Houston, J., concurring in part and dissenting in part)).

*Borders*, then, involved two interrelated facts absent from our case. First, the arrest challenged in *Borders* was warrantless, thus making the discretionary-function prong of the immunity analysis dispositive—if the police officer did not witness the misdemeanor

in question and therefore did not have probable cause, he was not performing a discretionary function within the meaning of § 6-5-338(a). *See Telfare*, 841 So. 2d at 1229 ("Alabama's Rules of Criminal Procedure and [its statutory provisions] do not allow law-enforcement officers the discretion to arrest alleged wrongdoers for misdemeanors not committed in the presence of the arresting officer."). This is evident in the *Borders* court's own statement of its holding:

> Viewing the evidence in the light most favorable to Borders, as we are required to do in reviewing a summary judgment, we cannot determine, as a matter of law, that Earle was engaged in a discretionary function when he arrested Borders, that is, that Earle had arguable probable cause in that officers of reasonable competence in the same circumstances and with the same knowledge would disagree as to whether probable cause existed.

*Borders*, 875 So. 2d at 1181. Second, the plaintiff in *Borders* did not even allege that the police officer acted in bad faith because that question was moot if the police officer was not performing a discretionary function. Here, the opposite is true, as Dr. Boyd does not deny that Chief Mitchell was performing a discretionary function within the scope of his law enforcement duties in gathering information and determining whether to swear out a warrant for Dr. Boyd's arrest, and instead argues for the bad-faith exception.

The Alabama Supreme Court's recent opinion in *Ex parte Harris*, 2016 WL 4204837 (Ala. July 29, 2016), is instructive. There, although the arrest was warrantless, the evidence indicated that "the conduct that prompted [the] arrest occurred in [the officer's] presence or view." *Ex parte Harris*, 2016 WL 4204837, at *8 (internal quotation marks omitted). Thus, the court explained, the officer was engaged in a discretionary function, and the burden shifted to the plaintiff to show one of the *Cranman* exceptions.

*Id.* The plaintiff, like Dr. Boyd here, argued that the officer acted "willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Id.* (internal quotation marks omitted). The *Harris* court applied the arguable-probable-cause standard to its analysis of the bad-faith prong for a false-arrest claim to determine that arguable probable cause existed, so "we cannot say that [the officer] acted willfully, maliciously, fraudulently, or in bad faith so as to remove him from the umbrella of State-agent immunity afforded him under *Ex parte Cranman*." *Id.* (internal quotation marks omitted). However, when the court addressed immunity in the context of a malicious-prosecution claim, it did not apply the arguable-probable-cause standard. *See id.* at *10 (defining probable cause "in the context of a malicious-prosecution claim" before determining that because probable cause existed, and the officer acted without malice, the officer was entitled to immunity under *Cranman* and § 6-5-338(a)).[15] Because the claim here is for malicious prosecution and Dr. Boyd does not dispute that Chief Mitchell was performing a discretionary function, the Alabama Supreme Court's opinion in *Harris* thus compels the court to apply the traditional standard for probable cause in determining whether the bad-faith exception established by *Cranman* bars Dr. Boyd's malicious-prosecution claim.

As stated earlier, malicious prosecution in Alabama entails (1) a judicial proceeding initiated or continued by the present defendant; (2) with malice; but (3) without probable cause; (4) that terminated in the present plaintiff's favor; and (5) caused damage to the

---

[15] *Harris* cited *Borders* for its arguable-probable-cause standard and characterized it as a false-arrest case. *See Harris*, 2016 WL 4204837, at *9. Thus, when *Harris* then applied the traditional probable cause standard to the malicious-prosecution claim, it implicitly held that the arguable-probable-cause standard does not apply to malicious-prosecution claims.

plaintiff. *Wood*, 323 F.3d at 882.  The record evidence establishes that a judicial proceeding was instituted (in the form of Dr. Boyd's criminal trial), that the proceeding terminated in Dr. Boyd's favor when the charges against him were dismissed, and that he was damaged as a result of the criminal charges.  Thus, the only elements at issue are probable cause and malice—the same issues that dictate whether Chief Mitchell is entitled to state-agent and discretionary-function immunity.  The court cannot recommend summary judgment for Chief Mitchell on the basis of state-agent and discretionary-function immunity because Dr. Boyd has submitted evidence sufficient to create a factual dispute as to both the existence of probable cause to arrest Dr. Boyd and Chief Mitchell's alleged malice.

Chief Mitchell counters that the undisputed facts demonstrate that he had probable cause to arrest Dr. Boyd's and that there is no evidence of malice. Doc. 42 at 24–25. Neither contention is supported by the record evidence.  First, there are factual disputes that prevent a finding of probable cause.   "[I]n the context of a malicious-prosecution claim," probable cause "is defined as a reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged." *Harris*, 2016 WL 4204837, at *10 (citations and internal quotation marks omitted).  In his brief, Chief Mitchell claims that the "likelihood of the custodian at issue harming additional children" is "irrelevant to the determination of whether Chief Mitchell had probable cause to arrest [Dr. Boyd] for Reckless Endangerment." Doc. 42 at 13.  However, Chief Mitchell's contention overlooks the plain language of the statute.  Because a "substantial risk" of serious physical injury is an integral element of the reckless-endangerment statute, *see* Ala. Code § 13A-6-24, the

likelihood of harm to the other students at Hayneville Middle School is pertinent to the question of whether probable caused existed—and it is disputed.  Indeed, if a jury were to conclude that there was little to no likelihood that Saffold would have harmed other students, it could find that Dr. Boyd did not engage in conduct that created a substantial risk of serious physical injury, and that therefore there was no probable cause for his arrest.  This conclusion is based on material facts that are very much in dispute.

Chief Mitchell argues that probable cause exists because (1) Saffold remained at school until the afternoon on the day of the incident, and (2) Chief Mitchell believed in "good faith" that Saffold returned to the school in the weeks after the incident took place but before he was arrested. Doc. 42 at 13–14.  It is undisputed that Saffold remained at the school on the day of the incident for a period of several hours, and entered uninvited into Chatman's office while the student was present. Doc. 46-5 at 7–9.  The court cannot conclude as a matter of law, on the basis of these facts alone, that there was actual probable cause for Dr. Boyd's arrest.  And the remaining facts that would support a finding of probable cause are disputed.  Though Chief Mitchell insists that he believed Saffold returned to the middle school, the parties dispute what exactly had been reported to Chief Mitchell.  In his brief, Dr. Boyd states, with no supporting citation, that Chief Mitchell was told that Saffold never returned to the school. Doc. 46 at 20–21.  While Principal Williams stated that he told Chief Mitchell that Saffold had not returned to the school, the timing of this conversation is unknown. Doc. 46-5 at 21.  Chief Mitchell maintains that Chatman told him that Saffold returned to the middle school "a day or two after the incident," but she denies doing so. *See* Doc. 46-3 at 36; Doc. 46-4 at 10 (stating that Chief Mitchell would be

"mistaken" if he stated that Chatman told him that Saffold returned to the school).  Chief Mitchell further testified that the victim's mother reported to him that Dr. Boyd would transfer Saffold to the elementary school in Mosses after she objected to his return to Hayneville Middle. Doc. 46-3 at 26.  Chief Mitchell also stated that he knew Saffold was placed on administrative leave. Doc. 46-3 at 27.  The record before the court demonstrates a factual dispute regarding Chief Mitchell's knowledge of Saffold's whereabouts.

Furthermore, Dr. Boyd has presented evidence from which a reasonable juror could conclude that Chief Mitchell acted "willfully, maliciously, fraudulently, in bad faith, or beyond his . . . authority." *See Cranman*, 792 So. 2d at 392.  First, there is evidence that Chief Mitchell may have misrepresented several individuals' statements about the propriety of the arrest warrant.  For example, he stated that District Attorney Tesmer told him that "I think you've got probable cause," but Tesmer remembers that she did not believe probable cause was present. Doc. 46-3 at 27; Doc. 41-8 at 6–7.  There is also record evidence tending to show that Chief Mitchell misrepresented both Tesmer's and Mayor Lawrence's views on the arrest warrant when speaking with others in the community. Doc. 41-11 at 11–12; Doc. 46-8 at 11 ("[H]e did mention to me that the district attorney said she didn't have a problem with him . . . arresting Dr. Boyd.").  Finally, Chief Mitchell testified that Chatman told him that Saffold returned to the middle school in the wake of the incident, while Chatman maintains that she "told him that I didn't know either way whether he did or didn't." Doc. 46-4 at 10.  Viewing the evidence in the light most favorable to Dr. Boyd, these misrepresentations could be seen as evidence that Chief Mitchell knew, or at least suspected, that he did not have probable cause for Dr. Boyd's arrest and therefore set

out to legitimize the arrest by garnering support from others in the community.

Further, Dr. Boyd has presented evidence from which a jury could conclude that Chief Mitchell had ill will toward Dr. Boyd.  For example, Chief Mitchell repeatedly told Chatman and Principal Williams that he was not investigating them for any wrongdoing, and instead was only investigating Dr. Boyd. Doc. 46-5 at 11 & 21–22; Doc. 46-4 at 10. In his reply brief, Chief Mitchell contends that the testimony "shows only that Mitchell informed them that he was only investigating Plaintiff, not the subordinate employees." Doc. 50 at 3.  This may be true, but these employees, particularly Principal Williams, theoretically could have been liable for any decision to allow Saffold to remain at the school on the day of the incident.  Principal Williams also stated that he left a meeting with Chief Mitchell with "some uneasiness" because he felt like the situation was becoming "personal," as if Chief Mitchell "really wanted Dr. Boyd at that point." Doc. 46-5 at 24. And, as discussed earlier, Chief Mitchell was so insistent on arresting Dr. Boyd in public that he was willing to face the threat of losing his job in order to do so. Doc. 46-8 at 7.

Finally, a jury could infer malice from Chief Mitchell and Dr. Boyd's past interactions.  As referenced above, in approximately 2008 or 2009, Chief Mitchell met with Dr. Boyd about a potential contract between the School Board and the Hayneville Police Department for security at school athletic events. Doc. 41-2 at 16–17; Doc. 47-1 at 14. Ultimately, Dr. Boyd and the School Board decided that they could not enter into a security contract with the Hayneville Police Department at that time because a contract with the Sheriff's Department was already in place. Doc. 41-2 at 16–17.  Chief Mitchell stated that he "didn't dislike" the decision and "understood" it. Doc. 41-2.  However, Dr. Boyd

testified that Chief Mitchell was "insistent that I still give him a contract, allow him to do security services." Doc. 47-1 at 14.  According to Dr. Boyd, Chief Mitchell referenced the contract years later during their first conversation about the sexual assault, potentially exposing some lingering animus over the situation. Doc. 47-1 at 49.  Jason Burroughs, the assistant superintendent who witnessed the conversation, corroborated Dr. Boyd's account and stated that Chief Mitchell appeared "upset." Doc. 46-6 at 19.  In his deposition, Chief Mitchell admitted that he feels that Dr. Boyd "operates as a dictator," and does not focus on the best interests of the children. Doc. 41-2 at 19.  On this showing, a reasonable juror could infer that Chief Mitchell had ill will toward Dr. Boyd and acted in bad faith in seeking to arrest him.  As a result, the court is unable to recommend summary judgment in Chief Mitchell's favor on the basis of state-agent or discretionary-function immunity, and further concludes that, based on the factual disputes in the record, it should be left to the factfinder to decide whether Chief Mitchell ultimately acted in bad faith and without probable cause.[16] Therefore, the court recommends the denial of summary judgment for Chief Mitchell on Dr. Boyd's state-law malicious-prosecution claim.

    **b.**    **Defamation**

Dr. Boyd next asserts claims for libel and slander against Chief Mitchell, which together comprise the tort of defamation.  Chief Mitchell claims that he is entitled to

---

[16] In addition to the direct evidence of malice, malice may be inferred from a lack of probable cause. *See Delchamps, Inc.*, 738 So. 2d at 832–33.  However, this inference may only be made for the merits of the malicious-prosecution claim, not in an immunity analysis. *See Tuscaloosa Cnty.*, 796 at 1107 ("[L]egal malice, for purposes of a malicious-prosecution claim, is not sufficient to defeat a state agent's defense of discretionary-function immunity.").

immunity under Alabama law on all state-law claims.[17]   In Alabama, the elements for

defamation are:

> (1) a false and defamatory statement concerning the plaintiff; (2) an
> unprivileged communication of that statement to a third party; (3) fault
> amounting at least to negligence on the part of the defendant; and (4)
> either actionability of the statement irrespective of special harm or the
> existence of special harm caused by the publication of the statement.

*Wal-Mart Stores, Inc. v. Smitherman*, 872 So. 2d 833, 840 (Ala. 2003) (quoting *McCaig v.*

*Talladega Publ'g Co., Inc.*, 544 So. 2d 875, 877 (Ala. 1989)).   Whether the plaintiff is a

private person or a public official determines the plaintiff's burden of proof.   *Cottrell v.*

*Nat'l Collegiate Athletic Ass'n*, 975 So. 2d 306, 332–33 (Ala. 2007).   For example, if the

plaintiff is a public figure, the plaintiff must demonstrate that the defamatory statement

was made with "'actual malice'—that is, with knowledge that it was false or with reckless

disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–

80 (1964).   If the court determines that the plaintiff is a private person, the plaintiff need

only demonstrate that the statement was made negligently. *Cottrell*, 975 So. 2d at 333.

The Alabama Supreme Court has determined that the "threshold question whether

the actual-malice standard applies in a defamation action involves a two-pronged inquiry—

whether the [allegedly defamed party] is a public official and, if so, whether the allegedly

defamatory comments related to his conduct as a public official." *Smith v. Huntsville Times*

*Co.*, 888 So. 2d 492, 496 (Ala. 2004).   "Thus, the first prong concerns the defamation

plaintiff's *status*, while the second prong concerns the nexus between that position and the

---

[17] The court concludes that Chief Mitchell is not entitled to state-agent immunity because Dr. Boyd has produced sufficient evidence of malice to satisfy the *Cranman* exception. *See* Part IV.D.2.a.

*conduct* that is the subject of the defamation." *Id.* (internal quotation marks omitted).  A public official holds a position "that would invite public scrutiny" and his office "should be one of such importance that the public has a particular interest in the qualifications and performance of the person holding that office." *Barnett v. Mobile Cnty. Pers. Bd.*, 536 So. 2d 46, 54 (Ala. 1998).

As an initial matter, the court concludes that, as a school superintendent, Dr. Boyd is a public figure.  A superintendent's position as head of the school district invites public scrutiny, particularly in light of the societal importance of the education system and the fact that it is funded by taxpayer dollars. *See, e.g.*, *Warren v. Birmingham Bd. of Educ.*, 739 So. 2d 1125, 1129 (Ala. Civ. App. 1999) (affirming the trial court's conclusion that a member of the local Board of Education and school principal were "public officials similar to the mayor and town clerk in *Barnett*").   Furthermore, the allegedly defamatory comments at issue here related to Dr. Boyd's conduct as a public official—namely, his response to allegations of sexual abuse and the effect of his decisions on the wellbeing of the students within his school district.

In light of this finding, Dr. Boyd's evidence of libel and slander is insufficient to survive summary judgment.  Dr. Boyd alleges that Chief Mitchell "repeatedly interacted with the media, including calling a press conference, to destroy the reputation of Plaintiff Boyd and get him removed from the position of Superintendent of Lowndes County Schools." Doc. 46 at 13.  He then cites to portions of Dr. Boyd's and Chief Mitchell's depositions.  The evidence is scant.  Chief Mitchell conducted routine press conferences while investigating Saffold and later Dr. Boyd. *See* Doc. 46-3 at 47.  Though Dr. Boyd

claims that Chief Mitchell made a statement to the *Lowndes Signal* and several verbal communications that "imputed moral turpitude and reflected shame," the only actual statement in the record before the court reads: "I would like the citizens to have a voice in who they want to represent them as their superintendent." Doc. 32 at 20–22; Doc. 46-3 at 48.   Finally, Dr. Boyd testified that, on three occasions, Chief Mitchell appeared to be "talking about me and saying certain things about me on television." Doc. 47-1 at 66.   Even viewed in the light most favorable to Dr. Boyd, the evidence of record does not demonstrate that any defamatory statements were made.   Dr. Boyd has failed to provide sufficient factual support for the allegations in the Amended Complaint, and the court recommends granting summary judgment in Chief Mitchell's favor on Dr. Boyd's libel and slander claims.

## E.   Remaining State-Law Claims

Pursuant to 28 U.S.C. § 1367(c)(3), the undersigned recommends that the District Court decline to exercise supplemental jurisdiction over Dr. Boyd's two remaining state-law claims (negligence against the Town and malicious prosecution against Chief Mitchell) because the court recommends summary disposition of all of Dr. Boyd's claims arising under federal law. *See* 28 U.S.C. § 1367(c)(3) (stating that a district court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction").   Indeed, where all federal claims are dismissed prior to trial, district courts are "encouraged" to dismiss any remaining state-law claims. *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in

which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."). Before dismissing the remaining state-law claims, the court must consider the factors of judicial economy, convenience, fairness, and comity. *See Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 532 (11th Cir. 2015).

"Both comity and economy are served when issues of state law are resolved by state courts." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002). "Federal courts are (and should be) loath to wade into uncharted waters of state law, and should only do so when absolutely necessary to the disposition of a case." *Ameritox*, 803 F.3d at 540. If the federal claims in this case are dismissed, resolution of the remaining state-law claims will not be necessary to the disposition of the case. And although the court could speculate as to why it might be more convenient for Dr. Boyd to continue to litigate his state-law claims in this court, "every litigant who brings supplemental claims in court knowingly risks the dismissal of those claims." *Id.* at 539. The court is not aware of any reason that, even at the summary-judgment stage, it would be unfair to either party to litigate the remaining state-law claims in state court. *See, e.g.*, *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) ("If no federal claim survives summary judgment, the court sees no reason why the other claims should not be dismissed or remanded pursuant to 28 U.S.C. § 1367(c)(3)."). Moreover, none of the parties, all of whom reside or are located in Alabama, would be significantly inconvenienced by the litigation of the remaining state-law claims in state court. Therefore, because considerations of comity,

judicial economy, convenience, and fairness would favor the dismissal of the remaining state-law claims in this lawsuit, the undersigned recommends that the District Court decline to exercise supplemental jurisdiction if all federal claims are resolved.

## V.  CONCLUSION

For the reasons stated above, the undersigned Magistrate Judge RECOMMENDS that the motions for summary judgment (Docs. 41 & 43) be GRANTED in part and DENIED in part.  Specifically, the Magistrate Judge RECOMMENDS as follows:

1.      That summary judgment be entered in favor of Defendants David Daniel, George Davis, Kim Payton, Sheryll Phipher, Carole Scrushy on all claims, and that these Defendants be DISMISSED from this action;

2.      That summary judgment be entered in favor of the Town of Hayneville on counts 1–8, 10–11, and 13–17, and that these claims be DISMISSED with prejudice;

3.      That the Town of Hayneville's motion for summary judgment on count 9 (negligence) be DENIED, but that the court decline to exercise supplemental jurisdiction over this claim;

4.      That summary judgment be entered in favor of Kelvin Mitchell on counts 1–2, 7–10, 12–13, and 15–19, and that these claims be DISMISSED with prejudice; and

5.      That Kelvin Mitchell's motion for summary judgment on count 14 (malicious prosecution) be DENIED, but that the court decline to exercise supplemental jurisdiction over this claim.

It is further ORDERED that the parties are DIRECTED to file any objections to the report and recommendation **not later than April 4, 2017**.  Any objections filed must

specifically identify the findings in the Magistrate Judge's report and recommendation to which the party is objecting.  Frivolous, conclusive, or general objections will not be considered by the District Court.  The parties are advised that this report and recommendation is not a final order of the court and, therefore, is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report and recommendation shall bar the party from a *de novo* determination by the District Court of issues covered in the report and recommendation and shall bar the party from attacking on appeal factual findings in the report and recommendation accepted or adopted by the District Court, except upon grounds of plain error or manifest injustice. *See Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33 (11th Cir. 1982).

DONE this 21st day of March, 2017.

_____
             /s/ Gray M. Borden
UNITED STATES MAGISTRATE JUDGE